# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ————————————————— ) | |
| LUANNE LYNN MORAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 12-0801 (ABJ) |
| ) | |
| UNITED STATES CAPITOL POLICE, ) | |
| ) | |
| Defendant. ) | |
| ————————————————— ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Luanne Lynn Moran brought this action against the United States Capitol Police ("USCP"), alleging that defendant retaliated against her for engaging in protected activity in violation of the Congressional Accountability Act of 1995, 2 U.S.C. § 1301, *et seq.* ("CAA"). Defendant has moved for summary judgment.  Def.'s Mot. for Summ. J. [Dkt. # 17] ("Def.'s Mot."); Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. [Dkt. # 17] ("Def.'s Mem.").  Since defendant has advanced a legitimate, non-retaliatory reason for plaintiff's termination, and because plaintiff has failed to put forth sufficient evidence from which a reasonable juror could determine that defendant's proffered reason is pretextual, the Court will grant defendant's motion and dismiss the case.

## BACKGROUND

## I.  Factual Background

The following facts are undisputed, except where noted.  Plaintiff was employed as a Special Agent ("SA") with the USCP from October 1995 until her termination on October 19, 2011.  Aff. of Luanne Lynn Moran, Ex. 1 to Pl.'s Opp. to Def.'s Mot. [Dkt. # 18-1] ("Moran

Aff.") ¶ 2.  Beginning in 1998 and through her termination, plaintiff served with the Dignitary Protection Division.  *Id.*

### A.        Plaintiff's Internal Complaints Against Defendant

In January of 2005,[1] plaintiff filed an administrative complaint with the Office of Compliance, alleging that defendant discriminated against plaintiff on the basis of her gender when it denied her request to transfer to the detail protecting the then-Speaker of the House, Nancy Pelosi ("the Speaker").  Moran Aff. ¶ 4; Def.'s Mem. at 2.  This complaint was eventually settled, and plaintiff was assigned to the Speaker's detail in 2007.  Moran Aff. ¶¶ 4–5; Def.'s Mem. at 2.

In August and November of 2008, plaintiff filed two separate administrative complaints with defendant's Office of Professional Responsibility ("OPR").  Moran Aff. ¶¶ 9–10, 28.  The first alleged that plaintiff had been told by coworkers that Supervisory Special Agent ("SSA") Dorman Simmons had made sexually inappropriate comments to and about other female employees.  *Id.* ¶ 10.  Plaintiff was not present for any of these comments, and none were directed at her.  *Id.* ¶¶ 9–10; Def.'s Mem. at 3.  Plaintiff's second complaint claimed that defendant's employees, including SSA Simmons, were retaliating against plaintiff for filing the August complaint against SSA Simmons.  Moran Aff. ¶ 28.

---

1        In a prior related case, plaintiff attested that she filed this charge in 2005.  *See* Decl. of Luanne L. Moran, Ex. 1 to Pl.'s Opp. to Def.'s Mot. for Summ. J., No. 09-1819 [Dkt. # 35-1] ¶ 2.  Defendant also places this complaint in January of 2005, *see* Def.'s Mem. at 2, as did this Court in that prior case.  *See Moran v. U.S. Capitol Police Bd.*, 887 F. Supp. 2d 23, 27 (D.D.C. 2012).  However, plaintiff's affidavit in this case states that her complaint was filed in January of 2006.  Moran Aff. ¶ 4.  The Court finds that whether plaintiff brought this complaint in 2005 or 2006 is not a material fact, and will therefore refer to this date as 2005.

### B.    Defendant's Investigation of Plaintiff

On August 16, 2008, plaintiff's coworker SA Dana M. Susak filed a complaint with SSA Raymond L. Stonestreet – one of plaintiff's supervisors – alleging that plaintiff had referred to SA Susak as "trash," told her to "get the f*** away from [plaintiff's] truck" while on a protective detail in Washington, D.C., and suggested on a separate occasion while on a protective detail in Napa, California that SA Susak should be shot with a BB gun.[2]   USCP Report of Investigation – Truthfulness, Ex. 1 to Def.'s Mot [Dkt. # 17-1] ("Truthfulness Investigation Rep.") at 2–3; Email from Dana M. Susak to Raymond L. Stonestreet (Aug. 16, 2008), Attach. 4 to Truthfulness Investigation Rep. [Dkt. # 17-1] at 1; *see also* Moran Aff. ¶¶ 18–19.   SSA Stonestreet was present when plaintiff referred to SA Susak as "trash," but he was not present for the other incidents.   Memorandum from SSA Raymond L. Stonestreet, Attach. 5 to Truthfulness Investigation Rep. [Dkt. # 17-1] at 1; Moran Aff. ¶ 18.

On September 4, 2008, SSA Stonestreet began a formal investigation based on SA Susak's allegations, and on October 28, 2008, he interviewed plaintiff in connection with the investigation.   Truthfulness Investigation Rep. at 1–2; Moran Aff. ¶¶ 17–19.   SSA John A. DeWolfe was also present for the interview.   Truthfulness Investigation Rep. at 1; Moran Aff. ¶ 18.   Prior to the interview, plaintiff reviewed and signed Form 1009, "Rights and Responsibilities Relative to Administrative Investigations," which states that USCP employees "are compelled to truthfully and fully answer all questions posed by a supervisor" during an investigation.   Truthfulness Investigation Rep. at 1; Moran Aff. ¶ 18; USCP CP-1009, "Rights

---

2      SA Susak's grievance was only one in a series of complaints lodged against plaintiff by her fellow employees for disrespectful or offensive behavior. *See Moran*, 887 F. Supp. 2d at 27–28 (summarizing four separate allegations of misconduct for which plaintiff was investigated and disciplined in 2008).  While those incidents also contributed to the initiation of the investigations into plaintiff's conduct, they are not material to plaintiff's retaliation claim here.

and Responsibilities Relative to Administrative Investigations," Attach. 11 to Truthfulness Investigation Rep. [Dkt. # 17-1].

During the interview, SSA Stonestreet questioned plaintiff about the incidents involving SA Susak. The interview was not transcribed, and the parties differ as to the exact phrasing of the questions posed to plaintiff and the content of her answers. According to defendant, plaintiff was asked directly whether she used profanity toward SA Susak while on a protective detail in Washington, D.C. and whether she stated while on a protective detail in Napa, California that SA Susak "should be shot with a BB gun," and plaintiff specifically denied both allegations. Def.'s Mem. at 6; *see also* Truthfulness Investigation Rep. at 1 (stating that plaintiff "denied both allegations" that she directed profanity at SA Susak and that she stated that SA Susak should be shot with a BB gun). Defendant points to contemporaneous accounts in support of its rendition of events. *See* Interview Notes of SSA DeWolfe, Attach. 10 to Truthfulness Investigation Rep. [Dkt. # 17-1] ("DeWolfe Notes") (noting that plaintiff stated that she "would not use profanity towards SA Susak" and that she "denied making the threatening statement involving the BB gun"); Interview Notes of SSA Stonestreet, Attach. 12 to Truthfulness Investigation Rep. [Dkt. # 17-1] ("Stonestreet Notes") (stating that, regarding use of profanity, plaintiff said she "[d]idn't say it" and would "not curse [at] her" and that regarding the BB gun comment, plaintiff stated that "she didn't say" it).

However, in her affidavit in opposition to defendant's motion for summary judgment, plaintiff describes the interview differently, and she insists that when she spoke to SSA Stonestreet in October 2008, she truthfully admitted calling SA Susak trash, she admitted directing profanity at SA Susak, and she answered simply that she did not recall when asked about the BB gun remark. Moran Aff. ¶¶ 18–19.

After his meeting with plaintiff, SSA Stonestreet interviewed and took written statements from coworkers who witnessed the incidents in question or discussed them immediately afterwards with plaintiff.  Truthfulness Investigation Rep. at 1.  These interviews corroborated SA Susak's claims.  *See* Attachs. 2, 5, 7–9 to Truthfulness Investigation Rep. [Dkt. # 17-1].  At the conclusion of the investigation, SSA Stonestreet determined that plaintiff had made the comments in question and had violated the Rules of Conduct for Courtesy and Conduct Unbecoming of a USCP officer.  *See* USCP Report of Investigation – Courtesy and Conduct Unbecoming, Attach. 1 to Truthfulness Investigation Rep. [Dkt. # 17-1] at 12–13.  SSA Stonestreet also undertook a review of plaintiff's veracity during the interview, and he drafted a report of investigation relating to plaintiff's truthfulness.  Def.'s Mem. at 7 n.4; *see also* Draft USCP Report of Investigation – Truthfulness, Attach. 2 to Truthfulness Investigation Rep. [Dkt. # 17-1] ("SSA Stonestreet Truthfulness Investigation Draft Rep.") at 2.

Plaintiff was disciplined for the courtesy and conduct violations, and she appealed the decision to USCP Chief Phillip D. Morse in December 2008.  *See* Memorandum of Appeal, Attach. 3 to Truthfulness Investigation Rep. [Dkt. # 17-1].  In her appeal, plaintiff recounted an incident where, in her words, she had told SA Susak "to get the f*** out of my vehicle," and she acknowledged that she "did call Dana [Susak] trash."  *Id.* at 4.  Chief Morse noted that plaintiff's appeal letter contradicted the testimony she reportedly provided during the Stonestreet interview, and he forwarded the case to OPR for an investigation into whether plaintiff had made untruthful statements during the official administrative investigation into her conduct.  Decl. of Phillip D. Morse, Ex. 2 to Def.'s Mot [Dkt. # 17-2] ("Morse Decl.") ¶¶ 4–6.  In March 2009, plaintiff was placed on administrative leave as a result of the pending untruthfulness charge.  Moran Aff. ¶ 32.

In response to Chief Morse's referral, OPR Investigator Sergeant Shawn Huycke reviewed SSA Stonestreet's draft report, the notes of the interview taken by SSA Stonestreet and SSA DeWolfe, and the testimony of several witnesses, and he issued a report in April 2009. Truthfulness Investigation Rep. at 4. Investigator Huycke found that plaintiff told SSA Stonestreet that she had not made a comment about shooting SA Susak with a BB gun, but that two witnesses and SA Susak herself testified that plaintiff did make the statement. *Id.* at 3. Further, Investigator Huycke found that while plaintiff denied directing profanity at SA Susak during the Stonestreet interview, two witnesses confirmed that plaintiff had used profanity, and plaintiff herself subsequently acknowledged in her appeal to Officer Morse that she had cursed at SA Susak. *Id.* As a result, he determined by a preponderance of the evidence that plaintiff had committed a truthfulness violation by making false statements during the October 2008 interview. *Id.* Investigator Huycke has testified that he was not "told," "directed," or "instructed" by anyone to conclude that plaintiff had been untruthful, and that he was not "consulted by management officials who recommended that [he] so conclude." Dep. of Shawn K. Huycke, Feb. 23, 2011, Ex. 7 to Def.'s Mot. [Dkt. # 17-7] at 157:5–22.

OPR then forwarded plaintiff's case to Scharon L. Ball, the USCP Disciplinary Review Officer ("DRO"), for a penalty recommendation as to the truthfulness violation. Memorandum re: Review of OPR-09-039 (Special Agent Luanne Moran), Attach. 2 to Morse Decl. [Dkt. # 17-2] ("Ball Mem.") at 1. In a June 9, 2009 memorandum, DRO Ball noted that "[t]he USCP Draft Penalty Table recommends termination of employment for a first violation" of truthfulness, and that in "recent cases involving violations of this rule . . . each violating employee received . . . termination of employment." *Id.* at 3. Although DRO Ball found that plaintiff's thirteen years of employment with defendant and her previous positive performance evaluations

were "mitigating factor[s]," she recommended that plaintiff's employment be terminated in light of "the egregious nature of her misconduct of making untruthful statements during a Department investigation." *Id.* at 3–4. DRO Ball's termination recommendation was approved by plaintiff's Deputy Chief, Yancey Garner, on June 16, 2009. Morse Decl. ¶ 9; *see also* Ball Mem. at 1 (showing Deputy Chief Garner's signature and the word "approved").

In December 2009, plaintiff was given the opportunity to present her case before a four-member panel of defendant's Disciplinary Review Board ("DRB"). *See* USCP DRB Final Findings and Recommendations, Attach. 3 to Morse Decl. [Dkt. # 17-2] ("DRB Findings"); Moran Aff. ¶¶ 22–23. Plaintiff now states that her testimony before the DRB "was truthful" and was consistent with the version of events set forth in her affidavit in opposition to the summary judgment motion. Moran Aff. ¶ 23. In her affidavit, plaintiff maintains that she "consistently stated . . . that [she] told SA Susak to 'get the f*** out of the car' and that [she] did not, and to this day, do[es] not, recall threatening to shoot SA Susak with a BB gun." *Id.* ¶ 24. The DRB panel found plaintiff guilty of the truthfulness violation by a vote of three-to-one "[a]fter hearing testimony, reviewing the evidence introduced concerning aggravating and mitigating circumstances . . . and after examining [plaintiff's] personnel file and comparing any applicable penalties which have been assessed for similar infractions." DRB Findings at 3–5. The DRB panel recommended that plaintiff's employment be terminated. *Id.* at 6.

On January 4, 2010, plaintiff appealed the DRB panel's recommendation to Chief Morse, asserting that she was truthful during the October 2008 interview, that SSA Stonestreet's investigation was biased, and that numerous mitigating circumstances warranted a penalty less severe than termination. Letter from Matthew D. Estes re: Written Appeal of DRB Decision and Penalty Assessment, Attach. 4 to Morse Decl. [Dkt. # 17-2]. On September 16, 2011, Chief

Morse denied the appeal, finding that plaintiff had failed to produce any evidence to controvert the notes memorializing her answers during the interview or to show that the investigation was biased or retaliatory.  Letter from Phillip D. Morse re: Written Appeal of DRB Decision and Penalty Assessment, Attach. 5 to Morse Decl. [Dkt. # 17-2] ("DRB Appeal Denial").  Chief Morse also noted that plaintiff "has not taken responsibility for her actions even when provided numerous opportunities to do so," and that the untruthfulness charge was "a very serious matter." *Id.* at 3.  Accordingly, Chief Morse approved the DRB's recommendation of termination on September 16, 2011.  *Id.* at 4.  He submitted the matter to the Capitol Police Board ("CPB")[3] on September 26, 2011, and the CPB unanimously concurred with the termination recommendation. Memorandum re: Termination Recommendation for Luanne Moran, Attach. 6 to Morse Decl. [Dkt. # 17-2] ("CPB Termination Mem.").  Plaintiff's employment was terminated effective October 19, 2011.  Moran Aff. ¶ 2; Def.'s Mem. at 10.

## II.    Procedural History

Plaintiff has filed three separate suits before this Court stemming out of the series of events described above.  Plaintiff filed Civil Action 09-1819 ("*Moran I*") in September 2009, and amended her complaint in January 2010 to set forth six counts against defendant.  *See* Am. Compl., No. 09-1819 [Dkt. # 2].  Counts I and II alleged that defendant's issuance of two personal performance notes to plaintiff was retaliatory; Counts III and IV alleged that defendant's issuance of two command discipline citations to plaintiff was retaliatory; Count V alleged that defendant's suspension of plaintiff in March 2009 was retaliatory; and Count VI alleged that defendant's issuance of a third command discipline citation recommending plaintiff's termination was retaliatory.  *Id.*  The Court granted defendant's motion to dismiss five

---

3       The Capitol Police Board is composed of the Sergeants at Arms for the U.S. House of Representatives and the Senate, and the Architect of the Capitol.  Morse Decl. ¶ 13.

of the six counts, *see* Order (Oct. 27, 2011), No. 09-1819 [Dkt. # 29]; Mem. Op. (Oct. 27, 2011), No. 09-1819 [Dkt. # 30], and it later granted defendant's motion for summary judgment on the remaining count because plaintiff failed to offer sufficient evidence from which a reasonable juror could infer retaliation.  *See* Order (Aug. 20, 2012), No. 09-1819 [Dkt. # 38]; Mem. Op. (Aug. 20, 2012), No. 09-1819 [Dkt. # 39].

On May 17, 2012, while *Moran I* was still pending, plaintiff filed the one-count complaint in Civil Action 12-801 ("*Moran II*").  Compl., No. 12-801 [Dkt. # 1] ("*Moran II* Compl.").  Then, on September 20, 2012, plaintiff filed the one-count complaint in Civil Action 12-1561 ("*Moran III*"), repeating the same claim advanced in *Moran II*.  Compl., No. 12-1561 [Dkt. # 1] ("*Moran III* Compl.").  Both complaints alleged that defendant "unlawfully retaliated against Plaintiff for her engaging in protected activities, by, among other things, terminating Plaintiff's employment with USCP and engaging in a course of conduct with the purpose and intent of terminating Plaintiff's employment with USCP, based upon knowingly false charges." *Moran II* Compl. ¶ 69; *Moran III* Compl. ¶ 71.  The Court consolidated *Moran II* and *Moran III* on December 7, 2012.  Minute Entry (Dec. 7, 2012).[4]

---

4      Plaintiff argues that defendant's summary judgment motion should be denied outright because defendant did not file a separate answer to the *Moran III* complaint, and that "[t]he alleged facts are therefore admitted and . . . give rise to claims of retaliation under the CAA." Pl.'s Opp. to Def.'s Mot. [Dkt. # 18] ("Pl.'s Opp.") at 21–22.  Plaintiff answered the *Moran II* complaint, *see* Answer [Dkt. # 3], and on January 9, 2015, the Court ordered defendant to answer the *Moran III* complaint, as well.  Minute Order (Jan. 9, 2015).  Defendant complied on January 15, 2015, *see* Answer to Compl. Originally Filed in Case No. 12-1561 [Dkt. # 24], thus curing whatever defect may have existed in its responses to plaintiff's claims.  In any event, the Court finds that even if defendant had failed to answer the *Moran III* complaint, the *Moran II* and *Moran III* complaints are virtually indistinguishable, save for a few paragraphs relating to plaintiff's exhaustion of administrative remedies and the date of her termination.  *Compare Moran II* Compl. ¶¶ 8–11 *with Moran III* Compl. ¶¶ 8–12, 63.  In consideration of this case's convoluted history and the near identity of the complaints, the Court finds that the harsh sanction of denying defendant's summary judgment motion on this ground would be unwarranted.

Defendant moved to dismiss the consolidated complaint on res judicata grounds.  Def.'s Mot. to Dismiss [Dkt. # 10].  During a hearing on the record, this Court granted the motion in part, finding that insofar as plaintiff's claim was based on defendant's "course of conduct" leading up to her termination, it was precluded by the Court's summary judgment ruling in *Moran I*.  Minute Entry (Sept. 11, 2013); Tr. of Proceedings (Sept. 11, 2013) [Dkt. # 22] ("Mot. to Dismiss Tr.") at 10:17–13:18, 17:1–10.  The Court left intact only the part of Count I that alleged that plaintiff's termination was retaliatory.  Mot. to Dismiss Tr. at 13:19–17:10.  After discovery, in which plaintiff apparently declined to participate,[5] *see* Def.'s Mem. at 1 n.1, defendant moved for summary judgment.  Def.'s Mot.; Def.'s Mem.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  But the mere existence of

---

5      Defendant argues that, "[i]n light of Plaintiff's failure to respond to [defendant's] discovery requests . . . and Plaintiff's failure to notice even a single deposition since the Court issued its discovery Scheduling Order," the Court has the discretion to dismiss plaintiff's case *sua sponte* for failure to prosecute.  Def.'s Mem. at 1 n.1, citing Fed. R. Civ. P. 41(b).  Whatever her reasons for failing to participate in discovery after defendant's motion to dismiss was granted in part, plaintiff has actively opposed defendant's summary judgment motion.  *See generally* Pl.'s Opp.  In light of that fact, and in the interest of resolving this case on the merits, the Court declines to dismiss this case on that basis.

a factual dispute is insufficient to preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).  The non-movant may not, however, rest upon the allegations or denials in its pleadings, but must instead establish more than "[t]he mere existence of a scintilla of evidence" in support of its position.  *Anderson*, 477 U.S. at 252.  A court will "not accept bare conclusory allegations as fact."  *Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997); *see also District Intown Props Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999) ("[T]he court must assume the truth of all statements proffered by the non-movant except for conclusory statements lacking any factual basis in the record.").

## ANALYSIS

The retaliation provision of the Congressional Accountability Act makes it unlawful for an employer "to intimidate, take reprisal against, or otherwise discriminate against, any covered employee" because she "has opposed any practice made unlawful by this chapter, or because the covered employee has initiated proceedings, made a charge, or testified, assisted, or participated in any manner in a hearing or other proceedings under this chapter."  2 U.S.C. § 1317(a).  "CAA retaliation claims under 2 U.S.C. § 1317 are analyzed under the same standards as Title VII

retaliation claims."[6]  *Newton v. Office of the Architect of the Capitol*, 905 F. Supp. 2d 88, 93 (D.D.C. 2012); *see also* 2 U.S.C. §§ 1302(a)(2), 1311(a)(1) (the CAA extends the protections of Title VII to the legislative branch).   Thus, courts in this Circuit apply the familiar three-part *McDonnell Douglas* framework to CAA retaliation claims.  *Gordon v. Office of the Architect of the Capitol*, 928 F. Supp. 2d 196, 206 (D.D.C. 2013), citing *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 492–94 (D.C. Cir. 2008); *see also Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001) (explaining the *McDonnell Douglas* framework).

Under *McDonnell Douglas*, "the plaintiff bears the initial burden of 'establish[ing] a *prima facie* case of . . . discrimination.'"  *Gordon*, 928 F. Supp. 2d at 206, quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the plaintiff succeeds, the burden then shifts to the defendant to offer a "legitimate, nondiscriminatory reason" for the adverse employment action.  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (internal quotation marks and citations omitted).   "If the employer does so, 'the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence.'"  *Id.*, quoting *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

To make out a *prima facie* case of retaliation, a plaintiff must demonstrate:  "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two."  *Id.*, quoting *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).  At the summary judgment stage, however, where the employer has produced a legitimate, nondiscriminatory reason for its action, "'the district court need not – *and should not* – decide whether the plaintiff actually made out a *prima facie* case

---

6      For that reason, the Court will use the CAA and Title VII interchangeably in articulating the legal standard in this case.

under *McDonnell Douglas*.'" *Id.* at 678, quoting *Brady*, 520 F.3d at 494. Instead, the dispositive question becomes whether the plaintiff produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason for the adverse action and that the employer actually retaliated against the plaintiff. *Brady*, 520 F.3d at 495. In assessing this issue, the court is to consider "'all the evidence,' which includes not only the *prima facie* case but also the evidence the plaintiff offers to 'attack the employer's proffered explanation for its action and other evidence of retaliation.'" *Jones*, 557 F.3d at 677, quoting *Carter*, 387 F.3d at 878.

## I.   Defendant has offered a legitimate, non-retaliatory reason for plaintiff's termination.

Because plaintiff's retaliation claim reaches this Court at the summary judgment stage, the Court will follow the framework outlined above and will examine the reason defendant has given for plaintiff's termination. Defendant states that it terminated plaintiff's employment because "[s]he made untruthful statements during an investigation into her conduct towards other special agents." Def.'s Mem. at 18. Specifically, defendant terminated plaintiff's employment in light of its determination that, during the October 2008 interview, plaintiff denied using profanity toward SA Susak while on a protective detail in Washington, D.C., and denied stating that SA Susak should be shot with a BB gun while on a protective detail in Napa, California, and that those denials were untruthful. Truthfulness Investigation Rep. at 1, 3.

Upon review of plaintiff's appeal, Chief Morse found that this untruthfulness was an "egregious" infraction which "showed a disregard for [plaintiff's] duties as a police officer." DRB Appeal Denial at 3. Further, the conduct violated Operational Directive, PRF 1.3 Rules of Conduct, Category A: Duty to Obey, Rule A7: Truthfulness, which requires employees to "make truthful statements at all times . . . pertaining to official duties or matters affecting the Department" and "to cooperate fully and truthfully during Department Investigations." Morse

13

Decl. ¶ 7; USCP Operational Directive – Rules of Conduct, PRF 1.3, Attach. 1 to Morse Decl. [Dkt. # 17-2] ("Operational Directive") at 2.  Any violation of that Operational Directive subjects an employee "to such disciplinary action as deemed appropriate by the Chief of Police." Operational Directive at 1.  The USCP Draft Penalty Table recommends termination of employment for even a first violation, Ball Mem. at 3, and Chief Morse adopted that recommendation, noting that "[b]eing untruthful in an investigation is a very serious matter . . . for a law enforcement officer who is responsible for upholding the public trust."  DRB Appeal Denial at 3–4.

The Court finds that the reason offered by defendant – its determination that plaintiff was untruthful during an official investigation – would constitute a legitimate, non-retaliatory basis for plaintiff's termination, especially in light of defendant's policies and the manner in which similar cases have been handled by defendant.  *See* Ball Mem. at 3 (noting that in recent cases involving truthfulness violations, "each violating employee received . . . termination of employment" as their penalty).  Accordingly, the burden now shifts back to plaintiff to produce evidence sufficient for a reasonable jury to find that her truthfulness violation was not the real reason for her termination, and that instead, she was terminated in retaliation for the protected conduct in which she engaged.  *Brady*, 520 F.3d at 495; *see also Musick v. Salazar*, 839 F. Supp. 2d 86, 95 (D.D.C. 2012); *Manuel v. Potter*, 685 F. Supp. 2d 46, 62 (D.D.C. 2010).

## II.    Plaintiff has failed to put forth sufficient evidence from which a reasonable jury could infer that plaintiff's termination was in retaliation for her protected activity.

Once a defendant has offered a legitimate, non-retaliatory purpose for its action, the dispositive inquiry is "whether the employee's evidence creates a material dispute on the ultimate issue of retaliation 'either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence.'" *Jones,* 557 F.3d at 678, quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983).   In other words, a court must determine whether there is "sufficient evidence for a reasonable jury to infer retaliation."  *Id.* at 679.  The burden of proving retaliation "'remains at all times with the plaintiff.'"  *Thompson v. District of Columbia*, 573 F. Supp. 2d 64, 68 (D.D.C. 2008), quoting *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003).

An employee can create a material dispute on the issue of retaliation through a combination of "(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of [retaliation] that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer."  *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998).  Plaintiff has failed to carry her burden in any of these ways.

A.    **Plaintiff has failed to make out a *prima facie* case of retaliation because she cannot show a causal connection between her protected activity and her termination.**

Defendant acknowledges that "[p]laintiff has established the first two elements of a *prima facie* case of reprisal," that is, that she engaged in protected activity and that she suffered an adverse employment action.  Def.'s Mem. at 14.  However, defendant contends that plaintiff cannot establish a causal connection between her prior protected activity and the decision to terminate her employment in October 2011.  *Id.* at 14–17.

"[T]he strength of the plaintiff's *prima facie* case, especially the existence of a causal connection, can be a significant factor in [a plaintiff's] attempt to rebut the defendant's legitimate non-retaliatory reason for the adverse action."  *Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 152 (D.D.C. 2010), citing *Aka*, 156 F.3d at 1289 n.4.  But the inability to

demonstrate a causal connection can be sufficient to preclude that plaintiff from establishing pretext at the summary judgment stage.  *Laurent v. Bureau of Rehab., Inc.*, 544 F. Supp. 2d 17, 23 n.5 (D.D.C. 2008) (finding that the plaintiff could not show that the legitimate reason for her termination was a pretext for retaliation because she was "unable to show any causal connection between her complaints about a fellow employee's conduct and her dismissal").

A plaintiff can establish causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."  *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985).  These requirements are known as the "knowledge" and "timing" requirements.  *Timmons v. U.S. Capitol Police Bd.*, 407 F. Supp. 2d 8, 12 (D.D.C. 2005).  Defendant asserts that both are absent in this case.  Def.'s Mem. at 15–17.

## 1.    The timing does not give rise to a *prima facie* case of retaliation.

To satisfy the timing requirement, the proximity between the protected activity and the adverse employment action must be "very close."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted).  Some courts in this district have interpreted that requirement to mean within approximately three to four months.  *See, e.g.*, *Allen v. Napolitano*, 774 F. Supp. 2d 186, 201 n.2 (D.D.C. 2011) ("In the D.C. Circuit, courts have held that alleged retaliatory acts must occur within three or four months of the protected activity to establish causation by temporal proximity."); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118–19 (D.D.C. 2004) (explaining that an adverse action that occurred two days before the three-month mark after the protected activity "pushe[d] the temporal requirement . . . to its outer limit").  However it is quantified, the temporal proximity between the protected activity and a

plaintiff's termination must be close enough to permit a reasonable jury to infer that the adverse employment action was in retaliation for the plaintiff's lawful and protected conduct.

Plaintiff identifies four protected activities at the heart of her retaliation claim:  her January 2005 complaint regarding the denial of her request to transfer to the Speaker's detail, Pl.'s Opp. at 2; her August 2008 complaint that SSA Simmons made sexually inappropriate comments, *id.* at 3–4; her November 2008 complaint that defendant's employees retaliated against her for her complaint against SSA Simmons, *id.* at 14; and the September 2009 filing of the complaint in *Moran I*, *id.* at 23, 25.

Here, plaintiff was terminated more than two years after the latest of her protected activities:  Chief Morse denied plaintiff's appeal of the DRB's penalty recommendation on September 16, 2011, *see* DRB Appeal Denial; he recommended to the CPB that plaintiff's employment be terminated on September 26, 2011, CPB Termination Mem.; and the CPB then approved Chief Morse's recommendation and plaintiff's termination took effect on October 19, 2011.  Morse Decl. ¶ 14; Moran Aff. ¶ 2.  This series of events is so far removed in time from plaintiff's protected activities that there is no basis from which a jury could infer a causal connection.  If "[a]ction taken . . . 20 months later suggests, by itself, no causality at all," *Breeden*, 532 U.S. at 274, then plaintiff's termination more than two years after her last identified protected activity gives rise to little or no inference whatsoever.  Plaintiff has therefore failed to put forth sufficient timing evidence to create a genuine dispute of material fact as to causation.

> **2.    Plaintiff has not demonstrated the knowledge on the part of the decision maker needed to make out a *prima facie* case of retaliation.**

To fulfill the knowledge requirement, the official responsible for ordering the employee's adverse employment action must have had knowledge of the protected activity.  *Laboy v.*

*O'Neill*, No. 01-5322, 2002 WL 1050416, at *1 (D.C. Cir. Mar. 13, 2002), citing *Breeden*, 532

U.S. at 270–74; *see also Buggs v. Powell*, 293 F. Supp. 2d 150–51 (D.D.C. 2003) (finding that

plaintiff was unable to satisfy the knowledge requirement because "the record indicate[d] that the

selecting official was unaware of plaintiff's prior protected activity").

     Plaintiff insists that several members of her chain of command – in particular, SSA

Stonestreet and Chief Morse[7] – knew about some or all of her protected activities. *See* Pl.'s Opp.

at 9–11, 23–25.   Further, plaintiff contends that "each of [defendant's] investigators and

decision-makers[] was well-aware of Moran's protected activity" because SSA Stonestreet's

draft truthfulness investigation report was included in her appeal file, and she had specifically

mentioned her complaint against SSA Simmons during the October 2008 interview.   *Id.* at 10,

24–25; *see also* SSA Stonestreet Truthfulness Investigation Draft Rep. at 7 (noting that plaintiff

stated during the October 28, 2008 interview that "this investigation was witch hunt against her

because she filed a complaint against SSA Simmons").   But all this tends to show is that some of

the individuals involved in the investigatory and disciplinary process may have become generally

---

7     SSA Stonestreet was aware of plaintiff's 2005 complaint and the 2007 settlement when
he initiated the investigations into plaintiff's conduct.  Dep. of Raymond L. Stonestreet (Feb. 18,
2011), Ex. 2 to Pl.'s Opp. [Dkt. # 18-2] at 12:16–13:4 ("I know [plaintiff] came over [to the
Speaker's detail] as a result of a complaint.").  Additionally, there is some evidence in the record
that SSA Stonestreet knew about plaintiff's August 2008 complaint against SSA Simmons, as
plaintiff asserts that she told SSA Stonestreet about it during a conversation on August 14, 2008.
Pl.'s Opp. at 5; Moran Aff. ¶ 16.  But SSA Stonestreet only initiated the conduct and truthfulness
inquiries, *see* Truthfulness Investigation Rep. at 2–3, and had no further involvement in the
"course of conduct" leading up to plaintiff's termination or the final CPB panel decision.  Dep.
of  Raymond L. Stonestreet, Feb. 18, 2011, Ex. 6 to Def.'s Mot. [Dkt. # 17–6] at 295:4–13,
297:11–14 (testifying that he was not involved in deciding what penalty to give plaintiff for the
truthfulness violation).

     Chief Morse was aware that plaintiff "filed a complaint sometime in 2006 or 2007" at the
time he approved the recommendation that plaintiff be terminated, but did not recall the claims
or content of that complaint.  Morse Decl. ¶ 15.  But he did not make the final termination
decision, and, as discussed below, Chief Morse's recommendation to the CPB panel did not
reference plaintiff's protected activities in any way.

aware that plaintiff had previously filed a complaint against SSA Simmons after plaintiff herself

made it part of the case file.  *See* Moran Aff. ¶ 19; Pl.'s Opp. at 10.  And this does not support

the inference that these actors had knowledge of her *other* protected activities based on the

review of her appeal file.

In order to ascertain whether an official responsible for an adverse employment action

had the requisite knowledge, one must first determine what the adverse employment action is,

and then, who was responsible for it.  Plaintiff points to Chief Morse's September 16, 2011

termination recommendation, but, as the Court explained in its September 11, 2013 ruling on the

motion to dismiss in this case, any claim based on that employment action was barred by the

previous judgment in *Moran I*.[8]  So Morse's knowledge is irrelevant.

The only issue remaining is whether the members of the CPB, who took the adverse

action of accepting Chief Morse's termination recommendation, had knowledge of plaintiff's

protected activities.  *See* Mot. to Dismiss Tr. at 13:19–14:1, 14:16–15:2 (noting that "plaintiff's

challenge to the actual termination of her employment" is not barred by res judicata because

---

[8]     The Court previously dismissed as barred by res judicata that part of plaintiff's claim that challenged defendant's "course of conduct" leading up to her termination.  Mot. to Dismiss Tr. at 11:24–12:4, 17:4–7.  That course of conduct necessarily "encompasses some pre-termination acts that were not a part of the claims in *Moran I*."  *Id.* at 12:10–13.  But plaintiff had until March 30, 2012 to amend the *Moran I* complaint to challenge any additional allegedly retaliatory acts for which she had exhausted administrative remedies, and she never did so.  *Id.* at 5:17–6:4.  Those acts include Chief Morse's September 16, 2011 termination recommendation:  plaintiff appealed that decision on October 4, 2011, Compl. ¶¶ 61–62, and she acknowledges that she exhausted her administrative remedies regarding Morse's recommendation by February 2012, well before the March 2012 amendment deadline.  *Id.* ¶¶ 8–11.  So, even if plaintiff has shown that Chief Morse had some knowledge of her protected activities when he issued his termination recommendation, a challenge to that decision as retaliatory is barred by this Court's decision on the motion to dismiss and the doctrine of res judicata.  *See* Mot. to Dismiss Tr. at 12:17–22; *see also Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984) ("The doctrine of res judicata is that 'the parties . . . may not relitigate any ground for relief which they already have had an opportunity to litigate – even if they chose not to exploit that opportunity.'"), quoting *Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C. Cir. 1981).

"plaintiff did not finish the administrative prerequisites to filing her suit challenging the termination of her employment until August 6, 2012, which was well after the deadline for filing a motion for leave to amend in *Moran I*").  But there, plaintiff has failed to carry her burden.  She offers no evidence whatsoever to show that the CPB members were aware of her protected conduct, other than her unsupported and conclusory allegation that "each of the key personnel knew of Moran's protected activity through the investigation(s) and decision-making process."  Pl.'s Opp. at 24.  In fact, the record indicates that Chief Morse's termination recommendation memorandum to the CPB panel contained no reference to plaintiff's earlier administrative complaints or to the filing of the complaint in *Moran I*.  *See* CPB Termination Mem.  Plaintiff has therefore failed to demonstrate that a genuine dispute of material fact exists as to whether the CPB members – the individuals ultimately responsible for approving the termination – had the knowledge of her protected activities that would be needed to imply causation.

In its ruling on defendant's motion to dismiss, this Court cautioned the parties that they needed to "engage in an honest assessment of whether the plaintiff is going to be able to meet her burden to establish the causal connection between the protected activities and the adverse action that is still standing" – namely the termination.  Mot. to Dismiss Tr. at 17:10–15.  After reviewing the pleadings and the record evidence, the Court finds that plaintiff has failed to meet that burden, and that the lack of evidence supporting a causal connection between her protected activities and her termination renders plaintiff unable to establish that defendant's stated reason for her firing was pretextual.

**B.** **Plaintiff has failed to produce evidence sufficient to attack defendant's proffered reason for her termination sufficient for a reasonable jury to infer retaliation.**

Since plaintiff cannot establish the necessary elements of a *prima facie* case of retaliation, the Court must next determine whether plaintiff has presented any other evidence to disprove defendant's proffered reason for her termination. *See Aka*, 156 F.3d at 1289. Here, plaintiff maintains that she did not in fact lie to SSA Stonestreet about her comments to and about SA Susak, so she argues that there is a dispute of fact that must be submitted to a jury on the question of the legitimacy of her termination. Pl.'s Opp. at 11–12, 28; *see also* Moran Aff. ¶¶ 18–19, 23–24.

The D.C. Circuit has observed that at this stage, it is common for an employee to

> attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision. If the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts.

*Brady*, 520 F.3d at 495.

In *Brady*, the plaintiff had been demoted after allegedly making a sexual gesture in front of three other employees, and he sued, alleging that he was actually demoted because of his race. *Id.* at 491. The district court granted summary judgment in favor of the employer, and the plaintiff appealed, claiming that there was a material dispute about whether the incident actually occurred, and that it was a jury's responsibility to determine that fact. *Id.* at 495–96. The D.C. Circuit upheld the district court's findings, explaining that "[t]he question is not whether the underlying sexual harassment incident occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying sexual harassment incident occurred." *Id.* at 496. If an employee could defeat summary judgment simply by denying the underlying

21

activity for which he was disciplined, the court reasoned, an employee could effectively get to trial in any case. *Id.* Instead, a plaintiff must provide evidence that the employer is lying about its stated reasons for the adverse actions. *See id.*; *see also McGrath v. Clinton*, 674 F. Supp. 2d 131, 145 (D.D.C. 2009) (the plaintiff's only evidence that employer was lying about its stated reasons were "his own allegations," which was insufficient to prove retaliation).

In the present case, plaintiff's primary argument is that she did not actually lie during the October 28, 2008 interview, so defendant's decision to terminate her for the truthfulness violation was necessarily pretextual. *See* Pl.'s Opp. at 6–9, 11–17, 23–24, 28; Moran Aff. ¶¶ 18–19, 23–24. Specifically, plaintiff claims that during the interview she admitted calling SA Susak "trash" and telling her to "get the f*** out of the car," and that she honestly stated that she "didn't recall" making any comment about shooting SA Susak with a BB gun. Moran Aff. ¶¶ 18–19. In response to the notes taken by SSA Stonestreet and SSA DeWolfe that reflect that plaintiff instead denied making both statements, plaintiff argues that the notes were not taken "contemporaneously" or immediately after the interview, and that they were either purposefully falsified or inaccurate. Pl.'s Opp. at 6–7, 9, 15; Moran Aff. ¶¶ 20–22. Plaintiff insists that because "there are material and substantial disputes of fact as to what Moran was asked and what her responses were at the interview held on October 28, 2008," defendant's summary judgment motion must be denied. Pl.'s Opp. at 6.

Plaintiff's explanations – supported only by her own self-serving affidavit and appeal letter – do no nothing more than deny the facts of the underlying events, and this alone is not ordinarily enough to disprove defendant's stated grounds for its actions. *See, e.g.*, *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008) ("Summary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory

statements."); *Fields v. Office of Johnson,* 520 F. Supp. 2d 101, 105 (D.D.C. 2007) (noting that "[s]elf-serving testimony does not create genuine issues of material fact" for purposes of summary judgment).

And, in this case, the self-serving testimony is particularly suspect.  In the affidavit supplied by plaintiff in opposition to the instant motion for summary judgment, plaintiff acknowledged the incident in which she referred to SA Susak as "trash," but characterized it as "joking," and she admitted cursing at SA Susak later that day, but placed the conduct in the context of SA Susak's initiating an argument with her.  Moran Aff. ¶ 18.  The affidavit continues as follows:

> SSA Stonestreet then changed the subject, saying to me something to the effect that I threatened to shoot Dana Susak with a BB gun.  *I replied that I didn't recall any such incident and that I wouldn't threaten to shoot Dana Susak (with a BB gun or anything else).*

*Id.* ¶ 19 (emphasis added).  This sworn statement, submitted to the Court as an exhibit in this case, *Moran II*, Civil Action 12-0801, is the key piece of evidence proffered by plaintiff in support of her contention that she did not lie in the Stonestreet interview, and therefore that defendant's statement that she was terminated for untruthfulness is not worthy of belief.

But this self-serving evidence is not only contradicted by the notes taken at the time – it is flatly contradicted by a sworn declaration provided by plaintiff herself to this Court on another occasion.  In *Moran I*, Civil Action 09-1819, plaintiff executed a declaration in opposition to the motion for summary judgment in that case on February 14, 2012.  In it, she averred that in October 2008:

> I was interviewed by SSA Raymond Stonestreet about saying the word "f***" in front of SA Dana Susak and about an allegation that I made a threatening statement to SA Dana Susak in regards to a BB gun.  I told him that I did tell SA Dana Susak "to get the fuck out of my vehicle", *but*

> *that I did not threaten SA Susak with a BB gun*. . . . SSA Jack DeWolfe witnessed this interview.

Decl. of Luanne L. Moran, Ex. 1 to Pl.'s Opp. to Def.'s Mot. for Summ. J., No. 09-1819 [Dkt. # 35-1] ¶ 9 (emphasis added).

So plaintiff herself has already sworn to this Court that during the Stonestreet interview, she *denied* – and did not profess a failure to recall – the BB gun incident.  This is entirely consistent with defendant's rendition of events and it suggests that plaintiff's more recent affidavit – which is entitled to little weight in any event – does not create a genuine issue of material fact that would send this case to a jury.

What matters at the summary judgment stage is whether defendant honestly and reasonably believed that plaintiff had in fact been untruthful during an official investigation in violation of USCP policy.  *Brady*, 520 F.3d at 496.  The Court finds that defendant's belief was reasonable in light of all of the evidence, and that there is "no basis for permitting a jury to conclude that [defendant] is lying about the underlying facts."  *Id.* at 495.[9]

In further support of her contention that defendant's proffered reason for her termination is pretextual, plaintiff also claims that the "use of profanity [among USCP officers] was commonplace and not disciplined in any meaningful way," and therefore, that plaintiff was singled out by her supervisors.  Pl.'s Opp. at 12, 26; Moran Aff. ¶ 25.  But the adverse

---

9       In any event, plaintiff's focus on the alleged shortcomings of the truthfulness investigation – including the involvement of SSA Stonestreet and SSA Simmons, the accuracy and contemporaneity of SSA DeWolfe's notes, and the sufficiency of Investigator Huycke's inquiry – entirely misses the point.  As discussed above, the only portion of plaintiff's claim that remains intact relates exclusively to her termination, not to the course of conduct leading up to it. *See* Mot. to Dismiss Tr. at 11:24–12:4, 13:14–20, 17:1–10.  So even if the Court credits plaintiff's unsupported claims that she told the truth during the interview, that SSA Stonestreet and SSA DeWolfe fabricated their notes in retaliation for plaintiff's protected conduct, and that Investigator Huycke's inquiry was flawed, plaintiff still has not put forth sufficient evidence from which a reasonable jury could conclude that the CPB panel's decision to approve her termination was itself retaliatory.

employment action at issue here is defendant's termination of plaintiff for untruthfulness, not for the use of profanity. *See* CPB Termination Mem. at 1 (recommending that plaintiff be terminated for violation of "Operational Directive PRF 1.3, Rules of Conduct, Category A:  Duty to Obey, Rule A7:  Truthfulness").  And the record evidence demonstrates that termination for untruthfulness fell squarely within defendant's policies and precedent. *See* Ball Mem. at 3 (noting that "[t]he USCP Draft Penalty Table recommends termination of employment for a first violation" of the truthfulness directive, and that "[a] review of recent cases involving violations of this rule . . . reveals that each violating employee received . . . termination of employment.").

Plaintiff also contends that the fact that SSA Stonestreet was present when plaintiff referred to SA Susak as "trash" but took no disciplinary action in response, is further evidence that she was actually terminated in retaliation for her protected activity.  Pl.'s Opp. at 5–6; Moran Aff. ¶¶ 15, 18.  But once again, plaintiff was not terminated for her rude comments – she was terminated based on defendant's reasonable determination that she lied during an official investigation.  And SSA Stonestreet was only present for that one event, and not for the two more serious incidents that prompted the initial investigation. *See* Truthfulness Investigation Rep. at 1 (listing as the "specific allegations" against plaintiff as "the use of profanity toward SA Dana Susak" and "stating that Susak should be shot with a BB gun").

Further, plaintiff claims that she had never been the subject of any disciplinary actions or investigations until after she engaged in protected activity in August 2008.  Pl.'s Opp. at 3, 23; Moran Aff. ¶ 8.  But that does not tend to show that her termination was retaliatory, and the other disciplinary actions were dealt with in *Moran I* in any event.

Finally, plaintiff claims that Chief Morse offered to reinstate plaintiff if she withdrew the complaint she had filed in *Moran I*, Pl.'s Opp. at 18–19, 23; Moran Aff. ¶ 27, and that this demonstrates that plaintiff's termination for a truthfulness violation was pretextual:

> If, as Chief Morse contends, Moran was untruthful in the investigation and if such untruthfulness would essentially prevent her from ever testifying in the course of her official duties, then why would Chief Morse be willing to reinstate Moran under any circumstances?  The answer is clear – he knew that Moran was <u>not</u> untruthful and his actions to terminate Moran's employment were retaliatory for her protective [sic] activities.

Pl.'s Opp. at 19 n.9.   Once again, plaintiff has offered no evidence, apart from her own testimony, to support this assertion.   And the record indicates that while plaintiff was indeed given the opportunity to avoid termination, it was on the condition that she take responsibility for her actions by admitting to having lied during the investigation, not that she dismiss the pending lawsuit.   *See* DRB Appeal Denial at 3 ("I have provided every opportunity for Officer Moran to simply tell the truth and avoid a potential termination circumstance. . . . Officer Moran has opted not to do so."); *see also* CPB Termination Mem. at 1 ("SA Moran was provided every opportunity to simply tell the truth and avoid a potential termination circumstance but opted not to do so.").   In any event, Chief Morse did not determine plaintiff's punishment:   termination was first recommended by DRO Ball, *see* Ball Mem. at 4, and ratified by the DRB panel, *see* DRB Findings at 3, and final approval of her termination rested with the CBP panel.   *See* CPB Termination Mem.   So plaintiff's allegations regarding Chief Morse's conduct, even if true, cannot create a genuine dispute of material fact about defendant's motive for her termination.

## CONCLUSION

Because defendant has put forth a legitimate non-retaliatory reason for terminating plaintiff's employment, and because plaintiff has failed to produce sufficient evidence to create a

genuine dispute of material fact on any issue that would belie that explanation, the Court will grant defendant's motion for summary judgment.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  February 12, 2015